# CA No. 21-1583

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

UNITED STATES OF AMERICA,

Appellee,

v.

ABDIRASHID AHMED,

Defendant-Appellant.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

---

## BRIEF OF APPELLEE UNITED STATES OF AMERICA

---

Darcie N. McElwee
United States Attorney

Lindsay B. Feinberg
Assistant U.S. Attorney
100 Middle Street
East Tower, Sixth Floor
Portland, Maine 04101
(207) 780-3257

# TABLE OF CONTENTS

Table of Authorities ...................................................................................iii

Statement of Issue Presented .................................................................. vi

Statement of the Case ............................................................................... 1

Statement of Facts..................................................................................... 2
   A.  Prosecution Version ...................................................... 2
   B.  Revised Presentence Report and Objections Thereto ................... 4
   C.  Additional Presentence Litigation ................................ 10
   D.  Ahmed's Sentencing Hearing ...................................... 17

Summary of Argument.......................................................................... 24

Argument ............................................................................................... 25
   ANY ALLEGED ERROR IN THE DISTRICT COURT'S
   GUIDELINE CALCULATION WAS HARMLESS OR,
   ALTERNATIVELY, THE DISTRICT COURT'S BELOW-
   GUIDELINES SENTENCE WAS PROCEDURALLY AND
   SUBSTANTIVELY REASONABLE. ........................................ 25
   A. Standard of Review .............................................. 25
   B. Ahmed's Sentence Was Procedurally Sound ........................ 27
      1.  The alleged errors Ahmed identifies concerning the
         district court's loss calculation and role adjustment
         resulted in no prejudice to him .................................... 27
      2.  The district court's loss calculation was factually and
         legally sound .............................................. 29
      3.  The district court's determination that Ahmed
         qualified for organizer-leader adjustment for his role in
         the offense was factually and legally sound ............... 40
   C. Ahmed's Sentence Was Substantively Reasonable ............. 47

Conclusion............................................................................................. 50

Government's Addendum .......................................................... G-Add. 1

## TABLE OF AUTHORITIES

### Federal Cases

Gall v. United States, 552 U.S. 38 (2007)............................................25-26

Rivera-Gomez v. de Castro, 843 F.2d 631 (1st Cir. 1988).....................1-2

United States v. Acevedo-Hernández, 898 F.3d 150 (1st Cir. 2018) .....28

United States v. Alphas, 785 F.3d 775 (1st Cir. 2015) ...........................29

United States v. Arif, 897 F.3d 1 (1st Cir. 2018)  .............................29, 30

United States v. Bedini, 861 F.3d 10 (1st Cir. 2017)  ............................48

United States v. Brown, 26 F.4th 48 (1st Cir. 2022)  .............................49

United States v. Carrero-Hernández, 643 F.3d 344 (1st Cir. 2011)

.................................................................................................41, 45-46

United States v. Cox, 851 F.3d 113 (1st Cir. 2017).................................26

United States v. Curran, 525 F.3d 74 (1st Cir. 2008) ............................39

United States v. Del Valle-Rodríguez, 761 F.3d 171 (1st Cir. 2014)......25

United States v. Fernández-Garay, 788 F.3d 1 (1st Cir. 2015) .............28

United States v. Fuller, 897 F.2d 1217 (1st Cir. 1990)...........................41

United States v. Grullon, 996 F.3d 21 (1st Cir. 2021)  .....................42, 47

United States v. Hernández-Hernández, 964 F.3d 95 (1st Cir. 2020)  ..41

United States v. Hudson, 823 F.3d 11 (1st Cir. 2016)........ …………27-28

United States v. Klein, 543 F.3d 206 (5th Cir. 2008) .......................35-36

United States v. Mahmood, 820 F.3d 177 (5th Cir. 2016) ...................... 30

United States v. Marsh, 561 F.3d 81 (1st Cir. 2009) ............................ 28

United States v. Martin, 52 F.3d 87 (1st Cir. 2008) .............................. 26

United States v. Mathew, 916 F.3d 510 (5th Cir. 2019) ........................ 30

United States v. McCormick, 773 F.3d 357 (1st Cir. 2014) ............. 40, 47

United States v. McKinney, 5 F.4th 104 (1st Cir. 2021) ................. 40, 47

United States v. Millán-Machuca, 991 F.3d 7 (1st Cir. 2021) ......... 26, 49

United States v. Ortiz-Álvarez, 921 F.3d 313 (1st Cir. 2019) ..........27-28

United States v. O'Brien, 870 F.3d 11 (1st Cir. 2017) ........................... 26

United States v. Rostoff, 53 F.3d 398 (1st Cir. 1995) ............................ 39

United States v. Ruiz-Huertas, 792 F.3d 223 (1st Cir. 2015) ................ 26

United States v. Severino-Pacheco, 911 F.3d 14 (1st Cir. 2018) ............. 2

United States v. Tejada-Beltran, 50 F.3d 105 (1st Cir. 1995)................ 41

United States v. Villanueva Lorenzo, 802 F.3d 182 (1st Cir. 2015) ...... 25

United States v. Voccola, 99 F.3d 37 (1st Cir. 1996) .............................. 40

United States v. Zannino, 895 F.2d 1 (1st Cir. 1990) ...........................1-2

## Federal Statutes

18 U.S.C. § 1347 ............................................................................... 1

18 U.S.C. § 1349 ............................................................................... 1

18 U.S.C. § 3553 ............................................................................. 22

## Federal Rules

Fed. R. Crim. P. 36 ....................................................................... 1-2

## Federal Sentencing Guidelines

U.S.S.G. § 1B1.3(a)(1)(B)(iii) .................................................... 32

U.S.S.G. § 2B1.1(b)(1)........................................................... 7, 38

U.S.S.G. § 2B1.1(b)(7)............................................................ 7-8

U.S.S.G. § 2B1.1 cmt. n.3(C) ............................................... 29-30

U.S.S.G. § 2B1.1 cmt. n.3(E)(i)................................................. 10

U.S.S.G. § 2B1.1 cmt. n.3(F)(viii).............................................. 10

U.S.S.G. § 3B1.1(a) .................................................. 8, 21-22, 40, 41

U.S.S.G. § 3B1.1 cmt. 2 ......................................................... 46

U.S.S.G. § 3B1.1 cmt. 4 ..................................................... 41-42, 46

## STATEMENT OF ISSUE PRESENTED

**WHETHER ANY ALLEGED ERROR IN THE DISTRICT COURT'S GUIDELINE CALCULATION WAS HARMLESS OR, ALTERNATIVELY, WHETHER THE DISTRICT COURT'S BELOW-GUIDELINES SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY REASONABLE.**

## STATEMENT OF THE CASE

Defendant-Appellant Abdirashid Ahmed pled guilty to health care fraud, in violation of 18 U.S.C. § 1347.  Add. 8-12; D 416 at 2-29.[1]  At sentencing, the district court (Levy, C.J.) found, over Ahmed's objections, that the loss amount attributable to him was $1,863,264.85 and that he occupied an organizer-leader role.  JA 1305, 1326, 1331-32.  After calculating a guideline sentencing range of 57 to 71 months, the district court varied downward, sentencing Ahmed to 24 months' imprisonment. [2]  Id. at 1405-15.  In so doing, the district court made

---

[1] Citations are as follows: District Court's Docket as "D [ECF#] at [pg#];" Joint Record Appendix as "JA [pg#];" Sealed Appendix as "SA [pg#];" Defendant-Appellant's Addendum as "Add. [pg#];" Defendant-Appellant's opening brief as "D.Br. [pg#];" and Government's Addendum as "G-Add. [pg#]."

[2] Although the judgment, Add. 1, revised presentence report, SA 23, and Ahmed's opening brief, D.Br. 3, all indicate that Ahmed pled guilty to conspiracy to commit health care fraud, it is clear from the transcript of Ahmed's change-of-plea hearing that he, in fact, pled guilty to Count 1 of the Superseding Indictment, which charged a substantive count of health care fraud.  D 416 at 2-29.  No sentencing consequences flowed from this misunderstanding.  See 18 U.S.C. § 1349 (indicating that any person who conspires to commit health care fraud shall be subject to the same penalties prescribed for health care fraud).  Ahmed also has raised no claim on appeal with respect to this issue.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace."

clear that it would have imposed the same sentence untethered from

the guidelines.  Id. at 1417.  This timely appeal, in which Ahmed

challenges the procedural and substantive reasonableness of the district

court's below-guidelines sentence, followed.  Add. 25; D.Br. 2, 13-15.

## STATEMENT OF FACTS[3]

### A. Prosecution Version

From December 2014 to May 2018, Ahmed, a Somali interpreter,

executed a scheme to defraud MaineCare.[4]  D 149 at 1.  In the ordinary

course, MaineCare reimbursed approved health care providers for

---

(quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir.1988))).
Nevertheless, a limited remand to permit the district court to correct
the clerical error in the judgment would be appropriate.  Fed. R. Crim.
P. 36.

[3] Because Ahmed pled guilty without a plea agreement, the facts are
taken from the prosecution version of the offense filed in connection
with Ahmed's change-of-plea hearing, the revised presentence report,
and the evidence adduced both before and at sentencing.  See, e.g.,
United States v. Severino-Pacheco, 911 F.3d 14, 17 (1st Cir. 2018).

[4] At all times relevant to this case, Medicaid was a health care benefit
program funded with federal and state funds and administered by the
U.S. Department of Health and Human Services and by state agencies.
D 149 at 1; SA at 27. In Maine, Medicaid was part of MaineCare, and
MaineCare was administered by the Maine Department of Health and
Human Services.  Id.  As the Maine version of Medicaid, MaineCare
provided health care coverage to low-income individuals, individuals
with disabilities, and children. JA 470-71.

interpretive services where the interpreter's services were necessary and reasonable to communicate with patients regarding covered clinical services.  Id. at 1-2.  Straying far from the ordinary course, Ahmed worked with approved health care providers to submit fraudulent reimbursement claims to MaineCare for services that were ostensibly provided to Somali patients in need of mental health care.  Id. at 1-4.

Over the course of Ahmed's scheme to defraud MaineCare, he brought Somali patients to various mental health providers, and the mental health providers would file fraudulent reimbursement claims related to these patients.  D 149 at 1-4.  Some of these fraudulent reimbursement claims inflated the length of the patient's visit, while others sought reimbursement for visits that never occurred.  Id. at 2-4. On one notable occasion, a counselor working with Ahmed submitted fraudulent reimbursement claims for providing more than 24 hours of clinical and interpretive services in one day.  Id. at 2.

Ahmed also created and provided fraudulent documentation that falsely inflated the length of patients' visits and falsely claimed interpretive services were provided to nonexistent patients.  D 149 at 3. Ahmed took these steps to protect the ongoing scheme in case of an

audit by MaineCare.  Id.  In addition, Ahmed extracted kickback payments from one counseling agency with which he worked in exchange for referring more Somali patients to that agency.  Id.

MaineCare reimbursed the different mental health providers who worked with Ahmed for the fraudulent reimbursement claims that each provider submitted for clinical and interpretive services.  D 149 at 4. The providers, in turn, paid Ahmed, or companies affiliated with Ahmed, for these fraudulent claims.  Id.

## B. Revised Presentence Report And Objections Thereto

In preparation for sentencing, the probation office prepared Ahmed's revised presentence report ("PSR").  SA 23-49.  The offense conduct section of the PSR described Ahmed's multiyear, multifaceted scheme to defraud MaineCare in greater detail.  Id. at 27-31.

As the PSR explained, to receive reimbursement, approved health care providers used their assigned provider number to submit a claim to MaineCare that documented the patient's covered service, the date, time, and duration of the covered service, the cost of performing the covered service, as well as the interpreter's name, qualifications, and the language used.  SA 27-28.  Because interpreters were not assigned

separate provider numbers, health care providers would submit claims for both clinical and interpretive services, and MaineCare would reimburse the health care provider who would then reimburse the interpreter.  Id. at 28.  Both clinical and interpretive services were billed to MaineCare in units of time where each unit was 15 minutes.  Id.  MaineCare reimbursed $20 per unit of clinical services and $20 per unit of interpretive services.  Id.

In late 2014, Elizabeth Daigle, one counselor with whom Ahmed worked as an interpreter, began submitting fraudulent reimbursement claims for clinical and interpretive services.  SA 29.  Daigle submitted a total of 159 fraudulent reimbursement claims for patients who were "Ahmed's clients."  Id.  Each of these claims stated that 10 units or 2.5 hours of covered services had been provided, regardless of the actual duration of each patient's visit.  Id. at 28-29.  The loss amount attributed to Daigle and Ahmed was $32,954.  Id. at 29.

Between January 2015 and June 2017, Heather Borst, another counselor with whom Ahmed worked as an interpreter, submitted multiple fraudulent claims for clinical and interpretive services.  SA 28-29.  Like Daigle, the majority of the fraudulent reimbursement claims

5

submitted by Borst alleged 10 units or 2.5 hours of covered services had been provided as part of her "arrangement" with Ahmed.  <u>Id.</u> at 28. MaineCare reimbursed Borst for a total of 16,314 units of interpretive services that did not meet the program's minimum requirements.  <u>Id.</u> at 29.  The loss amount attributed to Borst and Ahmed was $326,217.50. <u>Id.</u>

In addition to Daigle and Borst, Ahmed's scheme to defraud MaineCare also involved multiple employees of the behavioral health agency Facing Change, P.A. ("Facing Change").  SA 29.  Ahmed began providing interpretive services for Facing Change's MaineCare patients in 2013.  <u>Id.</u>  Over time, employees of Facing Change worked with Ahmed to submit at least three distinct types of fraudulent reimbursement claims to MaineCare.  <u>Id.</u> at 30-31.  The first type inflated the duration of the patient's visit.  <u>Id.</u> at 31.  The second type billed for visits that never occurred.  <u>Id.</u>  The third type misrepresented the patient's symptoms and diagnoses, including by manufacturing and backdating documentation.  <u>Id.</u> at 30-31.

Between January 2016 and April 2018, MaineCare paid Facing Change $884,655.83 for fraudulent reimbursement claims involving

Ahmed and his co-defendant Garat Osman, who was first introduced to the scheme in December 2016.  SA 29, 31.  Ahmed also obtained a total of $23,482 in kickback payments from Facing Change, which he received for bringing Facing Change additional Somali patients so that Facing Change could continue overbilling MaineCare.  <u>Id.</u> at 29-30.  The loss amount attributable to Ahmed and Facing Change, including the kickback payments, was $908,137.83.  <u>Id.</u> at 31.

Turning from Ahmed's criminal conduct to the calculation of Ahmed's guideline sentencing range, two sentencing enhancements recommended in the PSR are relevant to Ahmed's claims on appeal.

First, based on the losses attributable to Ahmed's scheme to defraud with Daigle, Borst, Osman, and multiple employees of Facing Change, the probation office recommended a 14-level increase to Ahmed's base offense level of 6 because the total combined loss amount of $1,267,309.33 was more than $550,000, but less than $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1).  SA 34.  Relatedly, because Ahmed was convicted of a federal health care offense involving a government health care program, and because the loss to that program was more

than $1,000,000, the probation office also recommended an additional 2-level increase, pursuant to U.S.S.G. § 2B1.1(b)(7).  Id.

Second, the probation office recommended that Ahmed receive a 4-level upward adjustment for his role in the offense because he qualified as a leader or organizer of the scheme to defraud, pursuant to U.S.S.G. § 3B1.1(a).  SA 34.

The government objected to the loss amount calculation, claiming that it was too low.  SA 46.  To support its objection, the government provided additional documentation based on a loss analyst's assessment.  Id.  The PSR noted the government's objection and stated that it had adopted the government's alternative calculations, thereby resolving the government's objection.  Id.  As the government explained in a subsequent pleading, however, the loss calculation in the PSR did not adopt the government's alternative calculations, which attributed a loss amount of $816,253.11 to Borst and Ahmed and a total combined loss amount of more than $1,500,000.00 to Ahmed.  D 250 at 7.

Ahmed also objected to the loss amount calculation, claiming that it was too high.  SA 46-48.  He argued that the total combined loss amount attributable to him should be $276,874, which would count 50%

8

of the fraudulent billings associated with Daigle, 80% of the fraudulent billings associated with Borst, and none of the fraudulent billings associated with Facing Change.[5]  Id. at 46-47.  As to Daigle and Borst, Ahmed alleged that the loss calculation should be the actual overpayment amount.  Id.  As to Facing Change, Ahmed alleged that the kickbacks were legitimate bonus payments and that he was not responsible for the actions taken by employees of Facing Change, including overbilling MaineCare and misdiagnosing patients.  Id.  Ahmed added that a review of his financial records, including his personal and business accounts, established $893,803.10 in total deposits over the relevant period, which was less than the probation office's recommended loss amount.  Id. at 47.

Ahmed further objected to the aggravating role adjustment.  SA 48-49.  He denied that he was an organizer or leader of the scheme to defraud.  Id.  To the contrary, Ahmed insisted that he was an average

---

[5] Ahmed later created a different offset ratio, which proposed an offset ratio of 52% for 2016, 67% for 2017, and 83% for 2018.  JA 1446. According to Ahmed, he arrived at these percentages by taking the billing summaries, adding the total units billed, adding the units involving Ahmed, and devising a "rudimentary" offset ratio.  Id. at 1268-69.

participant because the idea to overbill originated with Facing Change and the agency's employees, and because the scheme could not have existed without the providers who submitted the fraudulent reimbursement claims to MaineCare.  <u>Id.</u> at 49.

## C. Additional Presentence Litigation

Prior to sentencing, the district court and the parties painstakingly addressed the loss calculation issue through multiple pleadings, supporting exhibits, and two separate presentence hearings. <u>See</u> <u>generally</u> JA 1450-57, 1203-22, 1224-93; D 250; D 251; D 251-1 to 251-2; D 252; D 255; D 258; D 262; D 325; D 326; D 326-1 to 326-24; D 333; D 341; D 343; D 343-1 to 343-14; D 348; D 357; D 357-1 to 357-7; D 373; D 374.

At the first presentence hearing on January 30, 2020, the district court orally granted Ahmed's motion for a presentence ruling regarding the defendant's burden of production to establish an offset for, or credit against, the loss amount under U.S.S.G. § 2B1.1 cmt. n.3(E)(i) & (F)(viii).  JA 1204-07.  Based on the district court's familiarity with the evidence introduced at the trial of Ahmed's co-defendant Nancy Ludwig, as well as the other evidence identified in the government's filings, the

10

district court observed that Ahmed took part in a scheme that was rife

with fraud.  <u>Id.</u> at 1207-08.  As a result, the government could meet its

initial burden to establish loss amount by relying on the face value of

the fraudulent reimbursement claims that were submitted to

MaineCare.  <u>Id.</u> at 1207.  Once the government met its initial burden,

the burden of production shifted to Ahmed to show that he was entitled

to an offset by showing which claims represented legitimate health care

services for which MaineCare received fair market value and would

have paid for the services rendered.  <u>Id.</u> at 1208.

In the district court's view, showing entitlement to an offset was

not as simple as offering a formula to estimate the percentage of units

that were billed by providers and some sort of service was provided.  JA

1209.  This was because the scheme to defraud was "far more

comprehensive than the amount of units billed, touching also on

questions of whether legitimate intake and diagnoses were made and

whether actual legitimate counseling and case management services

took place."  <u>Id</u>.  To illustrate, the district court cited one Facing Change

patient who testified at Ludwig's trial that, from what the patient

understood, Ahmed was bringing him to Facing Change so that he could

address his blood pressure, toothache, and asthma.  Id. at 1210.

Additionally, the district court observed that "there was substantial

evidence that many counseling sessions that actually occurred were far

shorter than the time billed and the length of time one customarily

associates with legitimate counseling services."  Id.

The district court made clear that Ahmed was "not entitled to

credit for services that had little or no fair market value" and that

Ahmed would need to address "whether legitimate counseling services

were actually provided" to patients in "keeping with the standards of

the relevant mental health profession, whether the services were based

upon a proper diagnosis in keeping with the standards of the profession

and related issues, such as whether the counseling was subject to

proper supervision...and whether the counseling was properly

documented."  JA 1210-11.  The district court recognized this is

"undoubtedly going to be a difficult burden of production for [Ahmed] to

meet, but it seems to me it is what the law expects."  Id. at 1211.

On June 22, 2021, the district court held its second presentence

hearing, which it aptly described as "the long-awaited hearing on the

question of the amount of loss in this case."  JA 1226.  Both parties

presented additional arguments as to the loss calculation issue, informed by multiple exhibits.  Id. at 1226-93; D 374.

The government argued that because the case was rife with fraud and constituted a federal health care offense involving a government health care program, the face value of the fraudulent reimbursement claims provided the starting point for determining the loss amount.  JA 1229-30.  Relying on the testimony of several witnesses as well as the MaineCare manual, the government noted that MaineCare only receives value for services rendered when a patient receives medically necessary covered services with the appropriate prior authorizations and that those services are documented contemporaneously and accurately.  Id. at 1230.  The government also noted that interpretive services were only reimbursable by MaineCare if they were provided in conjunction with covered clinical services and if the interpreter was not running afoul of other MaineCare requirements, such as, by submitting reimbursement claims for family members.  Id. at 1231.

The government then detailed myriad ways in which the fraudulent reimbursement claims in Ahmed's case failed to provide any value to MaineCare, including: (a) Ahmed sought reimbursement for

interpretive services rendered to two family members; (b) Ahmed pressured employees at Facing Change to keep existing patients on the rolls even if they no longer needed services; (c) Ahmed worked with employees at Facing Change to manufacture false documentation and make services that were not medically necessary appear reimbursable, including by changing multiple patients' diagnoses; (d) Ahmed worked with Borst to seek reimbursement for between 7.5 and 12.5 hours of services rendered on days where no activity whatsoever was observed at Borst's office; (e) while under surveillance, Ahmed and Osman submitted interpreter slips seeking reimbursement, pursuant to which 6 of the visits were nonexistent, 14 of the visits lasted for less than 20 minutes, and the remaining 4 visits lasted for less than 30 minutes; and (f) Borst stated that the visits arranged by Ahmed were so short that Borst could not assess whether the patients actually needed mental health treatment.  JA 1231-43.

Because the patients for whom providers submitted reimbursement claims for clinical and interpretive services did not receive medically necessary covered services supported with prior authorization and accompanied by contemporaneous, accurate

14

documentation, the government argued that the appropriate loss calculation was $1,863,264.85, which reflected the fraudulent reimbursement claims submitted to MaineCare for both clinical and interpretive services by the providers involved in Ahmed's scheme to defraud. JA 1232, 1243-44, 1247.

Relying on principles of relevant conduct, Ahmed argued that the providers' rampant submission of fraudulent claims was not reasonably foreseeable to him, despite the fact that a MaineCare manual was found during a subsequent search of his house or office.  JA 1254-57.  Ahmed also suggested that the government had failed to present sufficient evidence to establish what he knew or should have known about the providers' overbilling.  Id. at 1259-60.  Although Ahmed acknowledged there was "some evidence" that he was in charge with respect to some of the providers and that they deferred to him over a long period of time, Ahmed insisted that "the providers could have stopped this at any time."  Id. at 1261.

Ahmed contended that because the Somali patients unquestionably needed interpretive services, the value of those interpretative services should not be included in the loss calculation.

JA 1262-64.  When the district court asked how Ahmed could reconcile his argument with the MaineCare requirement that interpretive services were only reimbursable if those services were provided in conjunction with covered MaineCare clinical services, Ahmed suggested that "some of the patients—not all of them—but some of the patients needed treatment," which was established through claims data.  Id. at 1266.  Ahmed also noted that the three patients who testified at Ludwig's trial that they did not have mental health problems, obtained mental health treatment from other providers who were not involved in the scheme to defraud.  Id. at 1267-68.

Based on the evidence provided, Ahmed urged the district court to conclude that he had met his burden of production and to apply his proposed offset ratio.  JA 1268-69.  In so arguing, Ahmed recognized that the district court did not have to be precise or utilize any particular methodology, but Ahmed suggested his "rudimentary" ratio provided a good way for the district court to determine an appropriate offset.  Id.

After considering the parties' arguments and confirming which exhibits had been admitted, the district court took the loss calculation issue under advisement until Ahmed's sentencing hearing.  JA 1291-93.

### D. Ahmed's Sentencing Hearing

Ahmed's sentencing hearing took place on July 16, 2021. At the outset, the district court noted that the parties previously submitted extensive briefing and provided numerous exhibits regarding the loss calculation issue. JA 1306. The lower court described the offense as "a long-lasting scheme" in which Ahmed and Osman "worked as Somali interpreters, and they conspired with mental health counselors to fraudulently bill MaineCare for mental health counseling services and accompanying translation services provided to Somali clients." Id. In addition, Ahmed "took kickbacks from mental health counselors in return for providing the counselors with Somali clients." Id.

Regarding the loss amount, the government argued that the entire amount paid by MaineCare over the course of Ahmed's scheme to defraud was the appropriate loss amount because "any services provided to the Somali clients were not legitimate and not eligible for MaineCare reimbursement, [in] that the claims either overstated the services provided, were for services that MaineCare would not have covered, or were for patients who would not have been eligible for MaineCare services if not for a fraudulent diagnosis[.]" JA 1306-07. By

contrast, Ahmed argued that while he and Osman did "overbill MaineCare, they also did provide some legitimate services to the Somali clients and that the loss amount should be offset by the value of those services." Id. at 1307.

After reviewing the applicable commentary and the relevant case law, the district court determined that regardless of where the burden falls in the context of establishing loss for a federal health care fraud offense, the government "has met that burden." JA 1309. The government put forth "significant evidence" of Ahmed's scheme to defraud with different providers, including Daigle, Borst, and Facing Change. Id. at 1311-12. Ultimately, the district court accepted the government's evidence showing that the loss amount in Ahmed's case was $1,863,264.85. Id. at 1318-19, 1324-26.[6]

As the district court described, Ahmed pressured Daigle to bill for services that were not provided, and there were days where Daigle did not know who the patients would be or where Ahmed brought family members for services. JA 1311. Similarly, Borst admitted that she did

---

[6] In so ruling, the district court expressly relied on government's exhibit 34 and government's exhibit 74. JA 561, 1326; G-Add. 1.

not provide any actual counseling services to her Somali patients because the visits were "so brief and disorganized." Id. at 1312. Even though no services were being provided, Borst "routinely submitted upwards of 70 hours a week of claims[,]" and she once "submitted claims that totaled 25 hours in a single day[,]" which relied on manufactured interpreter sheets and other manufactured records. Id. As to Ahmed and Facing Change, there was "chronic and rampant fraud[,]" including patients who "didn't even know that they were going for counseling." Id. at 1311.

According to the district court, the record demonstrated, and Ahmed did not dispute, that MaineCare "sought 100 percent recoupment" from the providers involved in Ahmed's scheme to defraud, and none of these providers "made the necessary showing that the services were medically necessary and would be covered by MaineCare and were actually provided to eligible MaineCare members." JA 1312-13. There was "voluminous evidence" that this case was "rife with fraud" and that "providers and interpreters made up patient diagnoses, grossly inflated their billings, billed for sessions that were never held, and submitted records that were both neither accurate nor

contemporaneous with the services." Id. at 1313. "Equally troubling, there [was] substantial evidence that the interpreters determined the who, when, and what of the treatment provided by the providers, that patients were given false diagnoses, and that even patients who may have needed services were simply not seen for a long enough time for them to receive those services." Id.

The district court rejected Ahmed's offset claim. JA 1313-14. While no one disputed that the patients spoke only Somali, MaineCare only allowed reimbursement for interpretive services provided in conjunction with a covered clinical service or a medically necessary follow-up visit. Id. at 1314-15. Nothing in the record established that Ahmed provided interpretive services in conjunction with legitimate counseling services for Somali patients who were properly diagnosed and properly treated for covered clinical services or medically necessary follow-up visits. Id. To the contrary, "there was substantial testimony calling into question the legitimacy of the translation services" provided by Ahmed, and even in cases where Borst believed Somali patients needed counseling services, Ahmed "did not let them stay at their appointments long enough for her to know for sure." Id. at 1315.

Ahmed also argued that he should not be held accountable for losses generated by the providers overbilling for clinical services (as opposed to interpretive services) because it was not reasonably foreseeable to him that the providers would overbill for those services. JA 1315-16. The district court disagreed, finding that Ahmed, who directly participated throughout the scheme to defraud MaineCare "either knew or should have known that the providers could only seek reimbursement for interpreter services in the same units of time as they sought reimbursement for the counseling services." Id. at 1316. Ahmed "had a sophisticated enough understanding of the MaineCare system to defraud it successfully and lucratively for a long period of time." Id. Ahmed also "knew that the records being submitted to MaineCare were not accurate and in many instances not contemporaneous[,]" which was "the whole point of the[] scheme." Id. at 1317. Because it was "entirely foreseeable that the providers' records in this case would not be accurate," the amounts paid by MaineCare with respect to the providers' clinical services were attributable to Ahmed. Id.

The district court next overruled Ahmed's objection the four-level role adjustment under U.S.S.G. § 3B1.1(a) for being a leader or

organizer.  JA 1326-32.  It found that Ahmed was the "common denominator" across the participating providers and that he participated in the scheme from beginning to end.  Id. at 1331.  In the district court's view, Ahmed was "a critically important driving force" in the scheme.  Id.  Ahmed not only "cajoled, encouraged, and pressured others" to participate in the scheme, but he also intimidated providers to encourage "more and more aggressive overbilling" and to influence the amounts that were overbilled.  Id. at 1331-32.  Even though Ahmed lacked a formal education, and he was not a health care provider, he displayed "initiative and leadership" in providing Somali patients that made the scheme possible, and he "personally received the largest share of the crime proceeds."  Id. at 1332.

Based on the district court's guideline analysis, Ahmed had a total offense level of 25 with a criminal history category of I, resulting in an advisory guideline range of 57 to 71 months' imprisonment.  JA 1405; SA 50.  After applying the factors enumerated in 18 U.S.C. § 3553(a), the district court varied downward to impose a sentence of 24 months' imprisonment.  JA at 1405-17.  The district court then stated:

> I want the record to reflect that I have carefully
> weighed all the defendant's arguments regarding

the guidelines as they affect his total offense level and criminal history category. I want it to be clear that even if I had accepted any of the objections or arguments that I have rejected, the sentence I have announced today would be the same untethered from the guidelines. That is, based on the 3553(a) sentencing factors, I would impose the same sentence, even if the guideline range would have been reduced by my acceptance of an argument that I have not accepted.

Id. at 1417. This timely sentencing appeal followed.

## SUMMARY OF THE ARGUMENT

Ahmed's appeal falls short.  As a threshold matter, any alleged error in the district court's guideline analysis was harmless because the district court made clear at sentencing that it would have imposed the same sentence untethered from the guidelines.  Ahmed has not (and cannot) show prejudice because the district court would have imposed the same sentence regardless of whether it sustained his objections to the loss calculation and the role adjustment.

Alternatively, if the Court reaches the merits of Ahmed's sentencing claims, which it need not do to resolve this appeal, the district court correctly calculated the loss amount attributable to Ahmed and appropriately assessed Ahmed a role adjustment for being an organizer or leader of the scheme to defraud.[7]  Because the district court's guideline analysis was legally and factually sound, Ahmed's cursory claim that his below-guidelines sentence was substantively unreasonable misses the mark.  This Court should affirm.

---

[7] In his brief, Ahmed addresses the role adjustment issue first and the loss calculation issue second.  D.Br. 17-42.  The government addresses Ahmed's sentencing claims in reverse order, analyzing the loss issue first and the role adjustment issue second.

# ARGUMENT

**ANY ALLEGED ERROR IN THE DISTRICT COURT'S GUIDELINE CALCULATION WAS HARMLESS OR, ALTERNATIVELY, THE DISTRICT COURT'S BELOW-GUIDELINES SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY REASONABLE.**

## A.    Standard Of Review

Ahmed alleges that the district court procedurally and substantively erred at sentencing.    D.Br. 13-15.  "The 'procedural dimension' of sentencing review includes the correctness of the court's application of the Guidelines, while '[t]he substantive dimension focuses on the duration of the sentence in light of the totality of the circumstances.'"  United States v. Villanueva Lorenzo, 802 F.3d 182, 184 (1st Cir. 2015) (quoting United States v. Del Valle-Rodríguez, 761 F.3d 171, 176 (1st Cir. 2014)).

Ahmed's challenges to the district court's loss amount enhancement and organizer-leader role adjustment target the procedural reasonableness of his sentence.  See Villanueva Lorenzo, 802 F.3d at 184 (noting that procedural errors include improperly calculating the defendant's sentencing guideline range and "selecting a sentence based on clearly erroneous facts" (quoting Gall v. United

States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007))). This Court's review of sentencing enhancements or adjustments consists of "clear error review [of] factual findings, de novo review [of] interpretations and applications of the guidelines, and abuse of discretion review [of] judgment calls." United States v. O'Brien, 870 F.3d 11, 15 (1st Cir. 2017) (quoting United States v. Cox, 851 F.3d 113, 119 (1st Cir. 2017)).

Ahmed also raises a conditional challenge to the substantive reasonableness of his sentence.[8] "A sentence is substantively reasonable so long as it rests on a 'plausible sentencing rationale' and embodies a 'defensible result.'" United States v. Ruiz-Huertas, 792 F.3d 223, 228 (1st Cir. 2015) (quoting United States v. Martin, 52 F.3d 87, 96 (1st Cir. 2008)). This Court rarely finds a below-guidelines sentence to be substantively unreasonable. United States v. Millán-Machuca, 991 F.3d 7, 32 (1st Cir. 2021).

---

[8] Ahmed seeks to pursue a challenge to the substantive reasonableness of his sentence only if this Court concludes that the district court incorrectly calculated his sentencing guideline range, thereby rendering his sentence procedurally unreasonable. D.Br. 43-45.

**B.    Ahmed's Sentence Was Procedurally Sound.**

1. The alleged errors Ahmed identifies concerning the district court's loss calculation and role adjustment resulted in no prejudice to him.

During Ahmed's sentencing, the district court announced, "I want it to be clear that even if I had accepted any of the objections or arguments that I have rejected, the sentence I have announced today would be the same untethered from the guidelines." JA 1417. The district court then underscored that "based on the 3553(a) sentencing factors, I would impose the same sentence, even if the guideline range would have been reduced by my acceptance of an argument that I have not accepted." Id.

This Court has consistently held that such statements by a district court foreclose, or render harmless, an appellant's claims of error in sentencing guidelines calculations. See United States v. Ortiz-Álvarez, 921 F.3d 313, 319 (1st Cir. 2019) ("That independent justification shows that the district court, while cognizant of the dueling guidelines calculations, 'intended to untether' its sentence from the guidelines calculations presented to him (and any errors in them), refuting [appellant's] claim of prejudice.") (quoting United States v.

27

Hudson, 823 F.3d 11, 19 (1st Cir. 2016)).  See also United States v.
Acevedo-Hernández, 898 F.3d 150, 172 (1st Cir. 2018) ("In light of this
clear indication in the record that the court would have imposed the
same sentence even without any of the alleged errors, we find that any
errors in calculating [appellant's] GSR would have been harmless.");
United States v. Marsh, 561 F.3d 81, 86 (1st Cir. 2009) ("[T]he district
court stated that it would have imposed the same sentence as a non-
Guideline sentence under 18 U.S.C. § 3553(a).  If we find an alleged
Guideline error would not have affected the district court's sentence, we
may affirm.") (citation omitted).

Even assuming the district court erred in its loss amount
calculation and its role adjustment, this Court "can say with fair
assurance that the sentencing court would have imposed the same
sentence even without the error."  United States v. Fernández-Garay,
788 F.3d 1, 5 (1st Cir. 2015) (internal citation and quotation marks
omitted).  Because Ahmed was not prejudiced by any alleged sentencing
errors, there is no basis for this Court to reverse the district court's
chosen sentence.

2.  <u>The district court's loss calculation was factually and legally sound</u>.

Ahmed challenges the district court's loss amount calculation, claiming that the district court erred in two ways.  D.Br. 29-42.  First, the district court incorrectly concluded that the amounts billed by the providers for clinical services (as opposed to interpretative services) were attributable to Ahmed as relevant conduct.  D.Br. 29-34.  Second, the district court mistakenly rejected Ahmed's request for credits against losses in the form of an offset for interpretive services that were legitimately provided.  D.Br. 34-42.  Both claims lack merit.

It is well settled that "a sentencing court may use the face value of the claims as a starting point in computing loss," where, as here, a "defendant's claims were demonstrably rife with fraud."  <u>United States v. Arif</u>, 897 F.3d 1, 11 (1st Cir. 2018) (quoting <u>United States v. Alphas</u>, 785 F.3d 775, 784 (1st Cir. 2015)).  "The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims."  <u>Id.</u>  "After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish."  <u>Alphas</u>, 785 F.3d at 784.  The district court "need only make

a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). The court's factual conclusions are reviewed for "clear error." <u>Arif</u>, 897 F.3d at 11.

Similarly, the Fifth Circuit has concluded, "[i]n the context of health care fraud, a defendant, to be entitled to an offset against an actual loss amount for purposes of restitution, must establish (1) 'that the services [he provided to Medicare beneficiaries] were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud.'" <u>United States v. Mathew</u>, 916 F.3d 510, 521 (5th Cir. 2019) (quoting <u>United States v. Mahmood</u>, 820 F.3d 177, 194 (5th Cir. 2016)).

Here, the district court correctly outlined the applicable legal standards, finding that the government successfully met its initial burden of establishing loss for this federal health care fraud offense by providing "significant evidence" of Ahmed's sprawling scheme to defraud with different providers, including Daigle, Borst, and Facing Change. JA 1309, 1311-13. Among other things, the district court cited record evidence that MaineCare "sought 100 percent recoupment" from the providers involved in Ahmed's scheme to defraud, and none of the providers "made the necessary showing that the services were medically

necessary and would be covered by MaineCare and were actually

provided to eligible MaineCare members." Id. at 1312-13.  The district

court also cited record evidence that "providers and interpreters made

up patient diagnoses, grossly inflated their billings, billed for sessions

that were never held, and submitted records that were both neither

accurate nor contemporaneous with the services." Id. at 1313.

Additionally, the district court found "substantial evidence that the

interpreters determined the who, when, and what of the treatment

provided by the providers, that patients were given false diagnoses, and

that even patients who may have needed services were simply not seen

for a long enough time for them to receive those services." Id.

The district court considered and rejected Ahmed's argument that

any losses generated by the providers overbilling for clinical services (as

opposed to interpretive services) should not be attributed to him as

relevant conduct.  JA 1315-16. As a direct participant in the scheme to

defraud, Ahmed "either knew or should have known that the providers

could only seek reimbursement for interpreter services in the same

units of time as they sought reimbursement for the counseling services."

Id. at 1316.  While Ahmed pointed to his lack of sophistication as an

immigrant who had much less formal education than the providers, the district court found that Ahmed "had a sophisticated enough understanding of the MaineCare system to defraud it successfully and lucratively for a long period of time." Id. Moreover, no one disputed that Ahmed "knew that the records being submitted to MaineCare were not accurate and in many instances not contemporaneous[,]" which was essentially "the whole point of the[] scheme." Id. at 1317. Because it was "entirely foreseeable that the providers' records in this case would not be accurate," the amounts paid by MaineCare with respect to the providers' clinical services were attributable to Ahmed. Id. See U.S.S.G. § 1B1.3(a)(1)(B)(iii).

Although Ahmed may disagree with the district court's assessment of the record evidence, he does not argue that any of the district court's factual findings in this regard were clearly erroneous. Nor could he. Instead, Ahmed alleges that he lacked a sophisticated enough understanding of the MaineCare program to be held responsible for the providers' submission of fraudulent reimbursement claims for clinical services and that the district court did not make sufficiently

particularized findings as to his accountability for the conduct of others. D.Br. 29-34.  Both of these self-serving allegations miss the mark.

As to Ahmed's first allegation, any assertion as to his lack of sophistication about the MaineCare program ignores large swaths of the record evidence, including virtually all of the presentence litigation as to the loss calculation issue.  During this presentence litigation, Ahmed acknowledged there was evidence indicating that he had some level of knowledge about the MaineCare program, including the fact that Ahmed had a MaineCare manual at his house or office and the careful actions he took to advance and protect the ongoing scheme to defraud while under surveillance by law enforcement.[9]  JA 1256-57. Ahmed also acknowledged there was "some evidence" that he was, in the district court's words, "very much in charge with respect to some of

---

[9] Between June 2017 and October 2017, law enforcement consensually recorded multiple conversations involving Ahmed, Borst, and Osman. See JA 66-116, 118-165, 168-205, 209-276, 279-303, 306-342, 1128-93. Over the course of these recorded conversations, Ahmed regularly discussed strategies and techniques to overbill MaineCare as well as to create and provide fraudulent documentation in case of an audit.  Id.  In July 2017, law enforcement also conducted surveillance at Borst's office, which confirmed the fraudulent nature of the reimbursement claims being submitted to MaineCare on behalf of Somali patients being supplied by Ahmed.  SA 28-29.

these therapists," and that he therefore "would have some insight as to what the therapists" were doing in terms of their billing practices for clinical services.[10] Id. at 1261.

As to Ahmed's second allegation, the district court made individualized findings regarding the scope of Ahmed's relevant conduct. For example, the district court distinguished between the relevant conduct that could be attributed to Ahmed and the relevant conduct that could be attributed to Osman, who was not only subservient to Ahmed, but also less involved in the scheme.  JA 560, 1315-17, 1331-32, 1407-08; D 395 at 16-17, 35.  The district court's individualized assessment of Ahmed and Osman's relevant conduct is further illustrated by the district court's different loss calculations and restitution amounts for Ahmed and Osman.  JA 1326, 1416-17; D 395 at 32, 39.

The district court also rejected Ahmed's argument that he was entitled to an offset for some interpretive services he provided.  JA 1313-14.  As the district court found, while the Somali patients needed

---

[10] The control that Ahmed exerted over different providers is discussed in more detail in the next section. See infra 44-45.

interpretive services, MaineCare only allowed reimbursement for interpretive services provided in conjunction with a covered clinical service or a medically necessary follow-up visit. Id. at 1314-15. Nothing in the record evidence established that Ahmed provided interpretive services in conjunction with legitimate counseling services for Somali patients who were properly diagnosed and properly treated for covered clinical services or medically necessary follow-up visits. Id. To the contrary, "there was substantial testimony calling into question the legitimacy of the translation services" provided by Ahmed, and even in certain cases where Borst believed Somali patients needed counseling services, Ahmed "did not let them stay at their appointments long enough for her to know for sure." Id.

Ahmed makes no effort to demonstrate that these findings were clearly erroneous. Instead, he attempts to analogize the facts of his case with the facts of a Fifth Circuit case in which a physician submitted fraudulent reimbursement claims related to office visits but prescribed actual medications to patients that they would administer themselves. United States v. Klein, 543 F.3d 206, 208-09 (5th Cir. 2008). The Fifth Circuit in Klein concluded that the district court erred

by not giving the physician an offset for the medications that were dispensed to his patients.  Id. at 214-15.

Ahmed's analogy to Klein does not withstand scrutiny.  As the district court noted when questioning Ahmed about his reliance on Klein at the loss amount hearing, the patients in Klein actually received medications they needed, meaning that the value of the medications was reimbursable.  JA 1264. By contrast, any interpretative services provided to the Somali patients here were not reimbursable unless they were provided in conjunction with an initially covered MaineCare health care service or a medically necessary follow-up visit for that initially covered health care service.  Id. at 1264-65. Stated another way, Ahmed was not entitled to reimbursement from MaineCare for providing interpretative services unless those interpretative services were provided in accordance with covered clinical services, which they were not.  Id.  As such, Ahmed's reliance on Klein is misplaced.

Equally misplaced is Ahmed's suggestion that he provided legitimate ancillary interpretative services for which he is entitled to an offset as a matter of fairness.  Ahmed's suggestion relies on a faulty

premise, namely that any of the ancillary interpretative services he provided were, in fact, legitimate.  The record evidence establishes that multiple individuals raised questions about the quality and legitimacy of the interpretive services Ahmed was providing.  JA 1251.  For example, there was testimony that patients would talk for a long time, and Ahmed's responses were comparatively brief.  Id.  There were also medical records introduced at trial that directly quoted Ahmed as stating a patient reported having been diagnosed with "schizophrenia" when the word "schizophrenia" does not exist in Somali.  Id.  As the district court emphasized, "the record doesn't establish that the patients involved were either properly diagnosed or properly treated, assuming that they were treated at all, and therefore that the [interpretive] services were reimbursable by MaineCare." Id. at 1315.  Given the substantial questions about the quality and legitimacy of Ahmed's interpretative services, Ahmed's suggestion that it is only fair that he receive an offset for having provided those services is dubious at best.

To the extent that Ahmed suggests that the "logical extreme" of the district court's rejection of his offset argument is that "a perfectly legitimate, law-abiding ancillary service provider could be denied

37

payment" because of the misdeeds of a primary service provider, D.Br. 40-41, his concern is misplaced for at least three reasons. First, the applicable legal standards concerning the calculation of losses and offsets in accordance with U.S.S.G. § 2B1.1(b)(1) are specific to defendants who have been convicted of various forms of economic offenses under federal criminal law. They do not, by design, involve innocent ancillary parties. Second, the calculation of loss under the guidelines is a wholly separate process from the rules or procedures that MaineCare or any other entity may have regarding withholding or reimbursing payments made to individuals who provided legitimate ancillary services as part of a broader fraud scheme of which they had no knowledge or involvement.

Third, and perhaps most importantly, Ahmed's inability to show that any of the interpretive services he provided were legitimate, separate and apart from the providers' clinical services, illustrates the inextricably intertwined nature of this particular scheme to defraud. In a different scheme in which primary and ancillary service providers did not operate in tandem, an ancillary service provider likely could show that their services were legitimate, regardless of the primary service

provider's actions.  Ahmed's failure to make a satisfactory showing here is a direct result of the overwhelming evidence of flagrant and pervasive fraud.  This speaks to the strength of the evidence in this case, and not to any fatal flaw in the district court's reasoning that will produce the extreme results predicted by Ahmed in future cases.

Because the government met its burden of establishing the losses that MaineCare suffered as a result of Ahmed's scheme to defraud by a preponderance of the evidence, and because the district court's findings in support of its loss amount calculation were amply supported by the record evidence and the relevant legal standards, this Court should conclude that the district court did not err, clearly or otherwise, in determining that the loss amount attributable to Ahmed was $1,863,264.85.  See United States v. Curran, 525 F.3d 74, 79 (1st Cir. 2008) (noting that a defendant who is "dissatisfied" with district court's loss amount calculation "must go a long way to demonstrate that the finding is clearly erroneous") (quoting United States v. Rostoff, 53 F.3d 398, 407 (1st Cir.1995)).

3.  <u>The district court's determination that Ahmed qualified for organizer-leader adjustment for his role in the offense was factually and legally sound</u>.

Ahmed also challenges the district court's imposition of the four-level role adjustment under U.S.S.G. § 3B1.1(a) based on Ahmed's status as a leader or organizer of the scheme to defraud.  D.Br. 17-28.  Ahmed claims that both the record evidence presented to support the four-level adjustment and the district court's factual findings about Ahmed's organizer-leader role were "insufficient."  D.Br. 18.  Neither of Ahmed's fact-bound claims have merit.

This Court reviews "a district court's fact-bound determination of a defendant's role in the offense for clear error."  <u>United States v. McKinney</u>, 5 F.4th 104, 108 (1st Cir. 2021) (quoting <u>United States v. Voccola</u>, 99 F.3d 37, 44 (1st Cir. 1996)).  "Where the raw facts are susceptible to competing inferences, the sentencing court's choice between those inferences cannot be clearly erroneous."  <u>United States v. McCormick</u>, 773 F.3d 357, 359 (1st Cir. 2014).

Section 3B1.1(a) authorizes increasing the defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was

40

otherwise extensive." U.S.S.G. § 3B1.1(a). "This enhancement requires a district court to make 'both a status determination—a finding that the defendant acted as an organizer or leader of the criminal activity—and a scope determination—a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guideline.'" <u>United States v. Hernández-Hernández</u>, 964 F.3d 95, 101 (1st Cir. 2020) (quoting <u>United States v. Tejada-Beltran</u>, 50 F.3d 105, 111 (1st Cir. 1995)).

To qualify as an organizer or leader under U.S.S.G. § 3B1.1(a), "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." <u>United States v. Carrero-Hernández</u>, 643 F.3d 344, 350 (1st Cir. 2011) (quoting <u>United States v. Fuller</u>, 897 F.2d 1217, 1220 (1st Cir. 1990)). Other relevant factors include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. 4.

Ahmed concedes that the scope of the scheme to defraud involved five or more participants.  D.Br. 18.  Therefore, the question before this Court is whether Ahmed's status as an organizer or leader was established by a preponderance of the record evidence.  <u>See</u> <u>United States v. Grullon</u>, 996 F.3d 21, 34 (1st Cir. 2021) (explaining "the government must show by a preponderance of the evidence that the defendant did more than participate in shared criminal activity; he must have led or facilitated that criminal activity" and noting "it is not particularly difficult for the government to meet its burden")).

As the government summarized at sentencing, ample record evidence supported the district court's conclusion that Ahmed qualified as an organizer or leader of the scheme to defraud, including (a) Osman and Borst waiting for Ahmed to make decisions; (b) Ahmed exercising control and authority over Osman; (c) Ahmed claiming the largest share of the proceeds from the fraudulent reimbursement claims; (d) Ahmed pressuring other participants about overbilling; (e) Ahmed controlling the flow of Somali patients to the providers, including when they could

come and how long they could stay; and (f) Ahmed's level of involvement in the scheme exceeding that of every other participant.  JA 1326-29.

The district court's factual findings in support of an organizer-leader role enhancement were similarly comprehensive.  JA 1331-32. The district court found that Ahmed was the "common denominator" across the three participating providers and that the nature and scope of Ahmed's participation stretched "from the very beginning with Daigle and continued until the end at Facing Change with the execution of a search warrant."  Id.  The district court also made detailed findings about Ahmed's role in planning and organizing the offense.  For example, the district court cited trial testimony that it was Ahmed, not the clinicians, who made appointments for patients.  Id.  At other times, Ahmed would show up unannounced with patients and would pressure other participants, including Ludwig, about billing practices.  Id.

Additionally, the district court cited testimony from two providers that Ahmed "proposed and influenced [them] to participate in the scheme," and intimidated them to encourage more aggressive overbilling.  JA 1331.  The district court further found that Ahmed "influence[d] the amounts that were billed," "generated false interpreter

slips for visits that never occurred," "made demands regarding the number of units that had to be billed," and that Osman "was in some respects subservient to" Ahmed. <u>Id.</u> at 1331-32. The district court also concluded that Ahmed "personally received the largest share of the crime proceeds." <u>Id.</u> at 1332.

Ahmed's claim that he could not have exercised authority over the clinicians, who were ultimately responsible for submitting the false diagnoses and fraudulent bills, is unavailing. D.Br. 21-22. Contrary to Ahmed's claim, the record evidence reflects that Daigle called Borst crying on two separate occasions because Ahmed was threatening to pull his clients, which made up approximately 75% of Daigle's caseload, unless Daigle acquiesced to Ahmed's demands to overbill. D 343 at 2. Borst also recalled Ahmed "raising his voice and things" and complying with Ahmed's demands to inflate the duration of patient's visits because "I didn't want to fight with him" and to submit claims for visits that never occurred "just to stop fighting and have him coming after me, I just agreed." <u>Id.</u> at 3, 5. Indeed, Borst once told Daigle that she "would sometimes hide from [Ahmed] in her car down the street from her office

so that he wouldn't know she was there" and that "Ahmed had even shown up unannounced at Borst's house, which scared her." JA 1443.

Similarly, the record evidence includes testimony from one Facing Change employee that Ahmed repeatedly threatened to pull his clients from the agency and take them to another provider, unless his demands about "units and money and getting his people in" were met. JA at 782-85. As this Facing Change employee explained, Ahmed "was more than just an interpreter[,]" "[h]e controlled the clients coming into that agency." Id. at 783. This Facing Change employee added, Ahmed "was always pushing, like, for as much as he could[,]" and "[i]t was always implied to bill as much as possible to get the numbers and keep [Ahmed] happy." Id. at 798.

Even if Ahmed's contention about his inability to exercise control over the providers were true—a point the government does not concede—the record evidence and the district court's factual findings were more than enough to support the imposition of organizer-leader role enhancement because Ahmed also organized or led yet another participant in the scheme to defraud, namely Osman. See Carrero-Hernández, 643 F.3d at 350 ("In order to meet § 3B1.1(a)'s status

45

requirement, the defendant must have either organized or led at least one other participant in the offense.")); see also U.S.S.G. § 3B1.1 cmt. 2.

Indeed, at sentencing, Ahmed acknowledged the fact that Osman was subservient to him, stating that it appeared that Ahmed managed or supervised Osman, and his argument against the role adjustment was "less forceful" if the issue was whether Ahmed should receive a three-level adjustment for fulfilling a managerial or supervisory role. JA 1330. Ahmed did not merely fulfill a managerial or supervisory role as to Osman. To the contrary, Ahmed exercised control and authority over Osman, including by making Osman execute interpreter sheets at Facing Change even though Ahmed was the interpreter. Id. at 3.

Moreover, Ahmed's exercise of some degree of control over others involved in the scheme to defraud should not be viewed in a vacuum. Other relevant factors that the district court properly considered prior to imposing of a four-level role adjustment on Ahmed were his exercise of decision-making authority, his longstanding participation in the offense, his claim to the largest share of the proceeds, and the nature and scope of his involvement in the offense. U.S.S.G. § 3B1.1 cmt. 4.

While Ahmed attempts to recast the record evidence and the district court's factual findings in a light more favorable to him, his efforts fall short because none of the district court's fact-bound determinations were clearly erroneous.  See McKinney, 5 F.4th at 108. When addressing whether a role adjustment should apply, this Court typically defers to the district court's view of the "raw facts."  Grullon, 996 F.3d at 35; see also McCormick, 773 F.3d at 359.  In accordance with the deference afforded to the district court's assessment of role adjustments, this Court should conclude that the district court did not err, clearly or otherwise, in determining that Ahmed qualified as an organizer or leader of the scheme to defraud.

## C. Ahmed's Sentence Was Substantively Reasonable.

Ahmed's final argument is that the district court's 24-month sentence was substantively unreasonable only if this Court agrees that his sentence was procedurally unreasonable.  D.Br. 43-45.  As detailed above, the district court's loss amount calculation and its imposition of a leadership-owner role adjustment were factually supported and legally sound.  Because Ahmed's procedural reasonableness challenges are

altogether unavailing, Ahmed's conditional substantive reasonableness challenge never leaves the starting gate.

Insofar as Ahmed suggests that he should have received the same sentence as Osman, the co-defendants fulfilled disparate roles in the scheme to defraud, which justified the different sentences that the district court imposed.  Indeed, not only was Osman involved in the scheme to defraud for a much shorter period, but Ahmed also exercised a degree of control and decision-making authority over Osman.  JA 3, 1202, 1243-46, 1330-32, 1407; SA 29; D 343 at 7-8. As a result, they are not similarly situated, and Ahmed's sentence need not mirror Osman's sentence to avoid unwarranted sentencing disparities.  See United States v. Bedini, 861 F.3d 10, 21 (1st Cir. 2017) (explaining that this Court routinely rejects sentencing disparity claims where the defendant fails to acknowledge material differences between his circumstances and the circumstances of his more leniently punished codefendant).

Similarly, insofar as Ahmed suggests that he may be entitled to a downward variance as a result of his familial responsibilities, including his role as a caretaker for his severely autistic child, the district court already took this factor and other mitigating factors into account when

it varied downward at Ahmed's sentencing hearing.  JA 1405-17; SA 52.

Ahmed's sentence was not rendered substantively unreasonable simply

because the district court did not apply as much emphasis to certain

mitigating factors as Ahmed hoped.  <u>United States v. Brown</u>, 26 F.4th

48, 71 (1st Cir. 2022).  To the contrary, the district court provided a

plausible rationale and delivered a defensible result.

Ahmed's case is not the "rare instance" in which this Court could

conclude that the district court somehow abused its discretion in

imposing a below-guidelines sentence of 24 months' imprisonment.

<u>Millán-Machuca</u>, 991 F.3d at 32.  Even assuming the district court

erred in its loss amount calculation and its role adjustment and

Ahmed's guideline sentencing range was lower as a result, the district

court's thorough and thoughtful sentencing rationale more than

supports the substantive reasonableness of Ahmed's 24-month

sentence—untethered from the guidelines—for spearheading a

multiyear, multifaceted scheme to defraud MaineCare that resulted in

nearly $2,000,000.00 in losses. <u>See</u> JA 1405-17.

## CONCLUSION

For the above-stated reasons, the judgment below should be affirmed.

Respectfully submitted,

DARCIE N. MCELWEE
United States Attorney

/s/ Lindsay B. Feinberg

Lindsay B. Feinberg
Assistant U.S. Attorney

Dated: May 9, 2022

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS

CA No. 21-1583

UNITED STATES OF AMERICA

v.

ABDIRASHID AHMED,

TO BE INCLUDED IMMEDIATELY BEFORE THE
CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT

1.     This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

        14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below (for example, Wordperfect 8, CG Times, 14 point):
            Century Schoolbook , 14 pt

        10 1/2 characters per inch, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and characters per inch below (for example, Wordperfect 8, Courier, 10 1/2 CPI):

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

     ❏     _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

     ☒     9,438 Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

     ❏     _____Lines of Mono spaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line print-out.

        /s/ Lindsay B. Feinberg
        Signature of Filing Party

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2022, I electronically filed the Brief of

Appellee United States of America with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to the

following:

> Peter E. Rodway, Esq.
> Rodway & Horodyski, P.A.
> P.O. Box 444
> Portland, Maine 04112-0444.

/s/ Katherine C. Whalen
Paralegal Specialist

**UNITED STATES v. AHMED**

**GOVERNMENT'S ADDENDUM**

## GOVERNMENT'S ADDENDUM INDEX

Government's Sentencing Exhibit 74.........................................G-Add. 1

Entry ID: 6494366   Date Filed: 05/09/2022   Page: 61   Document: 0117873615   Case: 21-1583

**Ahmed's Clients at Facing Change**
**Total Paid Claims 3/1/15 - 12/31/15**

| Professional Detail Last Svc Date | (Multiple Items) |
| --- | --- |

| Sum of Net Payment | Column Labels | | |
| --- | --- | --- | --- |
| | **2015** | **Grand Total** | |
| **Patient** | | | |
| | $ 368.00 | $ 368.00 | |
| | $ 11,725.16 | $ 11,725.16 | |
| | $ 14,691.08 | $ 14,691.08 | |
| | $ 16,232.02 | $ 16,232.02 | |
| | $ 13,033.20 | $ 13,033.20 | |
| | $ 21,910.37 | $ 21,910.37 | |
| | $ 2,997.40 | $ 2,997.40 | |
| | $ 3,248.25 | $ 3,248.25 | |
| | $ 8,087.86 | $ 8,087.86 | |
| | $ 1,100.14 | $ 1,100.14 | |
| | $ 244.00 | $ 244.00 | |
| | $ 13,914.08 | $ 13,914.08 | |
| | $ 3,462.00 | $ 3,462.00 | |
| | $ 20,907.51 | $ 20,907.51 | |
| | $ 5,211.16 | $ 5,211.16 | |
| | $ 4,482.50 | $ 4,482.50 | |
| | $ 11,199.92 | $ 11,199.92 | |
| | $ 11,291.38 | $ 11,291.38 | |
| | $ 17,848.96 | $ 17,848.96 | |
| | $ 19,760.50 | $ 19,760.50 | |
| | $ 8,645.76 | $ 8,645.76 | |
| | $ 164.00 | $ 164.00 | |
| | $ 16,887.58 | $ 16,887.58 | |
| | $ 10,677.70 | $ 10,677.70 | |
| **Grand Total** | **$ 238,090.53** | **$ 238,090.53** | |


GOVERNMENT EXHIBIT 74

G-ADD. 1